**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5365-14T2

STATE OF NEW JERSEY

    Plaintiff-Respondent,

v .

VONTE L. SKINNER, a/k/a
HASON SKINNER, HASAAN SKINNER,
and LAMAR ANDERSON,

    Defendant-Appellant.

_____

          Submitted September 27, 2017 — Decided November 29, 2017

          Before Judges Alvarez, Currier, and Geiger.

          On appeal from Superior Court of New Jersey,
          Law Division, Burlington County, Indictment
          No. 06-11-1756.

          Joseph E. Krakora, Public Defender, attorney
          for appellant (Richard Sparaco, designated
          counsel, on the brief).

          Scott A. Coffina, Burlington County
          Prosecutor, attorney for respondent (Nicole
          Handy, Assistant Prosecutor, of counsel and
          on the brief).

          Appellant filed a pro se supplemental brief.

PER CURIAM

After a third trial, defendant Vonte L. Skinner was convicted of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count five), and third-degree aggravated assault with a deadly weapon, N.J.S.A. 2C:12-1(b)(2) (count six).[1]  He was sentenced on May 22, 2015, to a mandatory extended term sentence of sixteen years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He appeals and we affirm.  The jury did not reach a verdict as to the most serious charge of first-degree attempted murder, N.J.S.A. 2C:5-1(a)(3) and N.J.S.A. 2C:11-3(a)(1) (count one).  It was dismissed with prejudice, along with any remaining counts of the indictment.

During his second trial, defendant had been acquitted of third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count three), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four), but convicted of the remaining counts of the indictment.  Defendant appealed, and the Supreme Court reversed.  The Court held that the verdict was tainted by the admission of violent rap lyrics that defendant authored.  Defendant's first trial ended in a mistrial.

---

[1] The verdict sheet interrogatory as to count six asked the jury whether defendant "did purposely or knowingly cause bodily injury . . . with a deadly weapon, to wit: a 9[-]millimeter handgun."

The victim's testimony was essentially the same during this trial as in the earlier proceedings. He was a street-level dealer who sold drugs for Brandon Rothwell, who had given him a TEC-9 machine gun in furtherance of the criminal enterprise.

Defendant began acting as Rothwell's muscle in 2005. After defendant joined the group, the victim's profits declined, and he began withholding money from Rothwell. Rothwell asked the victim to return the TEC-9 when he realized the victim was withholding a portion of the profits.

On November 8, 2005, defendant invited the victim to come to Willingboro to socialize, drink, and use drugs with him, but the victim declined because he had never gotten along with defendant. Around 10:00 p.m., defendant called the victim again, asking to meet so that he could buy drugs. At that point in time, the victim was in Camden and under the influence of PCP, marijuana, and alcohol. As he drove to the meeting site, defendant called him twice to confirm his location and the timing. Telephone communication records corroborated that defendant repeatedly called the victim.

When the victim arrived and got out of his car, he saw defendant walking towards him. Defendant drew a gun and started shooting from a distance of ten to twelve feet. Although the

3

victim saw someone standing behind defendant, that person did not shoot.

Defendant shot the victim seven times; he was paralyzed from the waist down as a result of his injuries. The victim recalled telling the emergency personnel that came to his aid that defendant was the shooter. Once he was hospitalized, however, the victim was initially reluctant to speak to police. During an interview, he indicated "that he really was not sure if he wanted to speak without his mom being there." When his mother arrived, he mentioned that defendant shot him. In a separate interview, the victim indicated that he had a continuing feud with an acquaintance who had robbed his cousin. He was certain that individual was not the assailant, even though the week before he had shot up that person's car. The victim recognized the weapon, a 9-millimeter handgun, used to shoot him as the one he shared with defendant and Rothwell in the drug business.

In addition to the victim, the State's witnesses included several officers and emergency personnel who arrived at the scene. William Palmer, a Willingboro First Aid Squad volunteer, accompanied the victim in an ambulance and asked him what happened. He recalled the victim saying he went to meet a friend, with whom he exchanged a few words, when the friend shot him. When asked

4

for the friend's name, the victim responded "Davonte" — defendant's first name. Palmer relayed this information to police.

Willingboro Police Department Detective Joseph Dey briefly spoke to the victim immediately before his transport. The victim told Dey that defendant had arranged to meet, and when he arrived, shot him. When Dey asked for the name of this person, the victim responded "Davonte." Defendant's cell phone was found at the scene.

Shortly after the incident, Burlington County Prosecutor's Office Detective Sergeant Steven Craig participated in a neighborhood canvass in the hopes of locating eyewitnesses. While in the area, Craig encountered three men who claimed they had been visiting a friend, and who denied any knowledge of the incident. One of them was later identified as the individual with whom the victim had the ongoing conflict. A person who the three men said they were visiting that night denied that they had been at his home.

Craig visited the victim at the hospital a few days later, and he also said the victim refused to talk to the authorities until his mother convinced him to do so. The victim told him, in addition to identifying defendant, that the day of the shooting, defendant had contacted him approximately six times. Defendant's phone records confirmed the multiple calls to the victim.

When police interviewed defendant, he admitted having met the victim at the scene. He said he wore a white t-shirt that evening, contrary to some neighbors' description of a man in the vicinity who wore a dark or burgundy sweatshirt. However, defendant said when he heard the shots, he ran away, hitched a ride with an acquaintance, and later called his girlfriend to take him home.

The victim repeated his description of the incident, including the identity of the shooter, in the months that followed. When tested, the discharged shells from the scene were found to have been ejected by a TEC-9 machine gun.

Defendant's mother, who testified on his behalf, denied he was the shooter. She said that although he admitted to her that he had been at the scene, he ran away when the trouble began. Defendant's mother also said that he only wore dark clothing, usually black.

The victim's cousin Alexandria Ross, the mother of Rothwell's child, testified on defendant's behalf. She had known defendant since he was a child, and denied that he had a weapon or sold drugs.

When cross-examined, Ross admitted she initially told police that defendant said he arranged to meet the victim to buy drugs. When she confronted defendant about his phone being found at the scene, he acknowledged that he was the last person who saw the

victim before he was shot. Ross told police that she was afraid of defendant.

Although cross-examined about the details of her original statement, which diverged from her trial testimony, Ross insisted that she did not believe defendant shot the victim. She claimed the victim told her, after his release from a physical rehabilitation facility, that Rothwell and defendant had nothing to do with the shooting.

Before the trial began, the trial judge denied defendant's motion to dismiss the indictment based on principles of double jeopardy, collateral estoppel, and fundamental fairness. Defendant repeated the arguments in support of his application for a new trial, and he also contended that the verdict was against the weight of the evidence. We discuss the judge's factual findings and rulings on the law on both applications in the relevant sections.

On appeal, defendant raises the following points:

> POINT I — THE TRIAL COURT SHOULD HAVE DISMISSED COUNTS ONE, FIVE AND SIX OF THE INDICTMENT ON GROUNDS OF DOUBLE JEOPARDY.

> POINT II — THE STATE WAS PRECLUDED FROM TRYING DEFENDANT ON THE REMAINING COUNTS OF THE INDICTMENT ON THE GROUNDS OF COLLATERAL ESTOPPEL.

POINT III — THE STATE WAS PRECLUDED FROM RETRYING DEFENDANT ON THE REMAINING COUNTS ON GROUNDS OF FUNDAMENTAL UNFAIRNESS.

POINT IV — DEFENDANT SHOULD NOT HAVE RECEIVED A MANDATORY EXTENDED TERM UNDER N.J.S.A. 2C:43-6c BECAUSE THE JURY HAD PREVIOUSLY ACQUITTED HIM OF POSSESSION OF A FIREARM.

POINT V — THE TRIAL COURT SHOULD HAVE GRANTED DEFENDANT'S MOTION FOR NEW TRIAL PURSUANT TO R. 3:20-1 ON THE GROUNDS THAT A NEW TRIAL WAS REQUIRED IN THE INTEREST OF JUSTICE IN THAT THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

In his uncounseled letter brief, defendant raises the following issue for our consideration:

POINT I

THE TRIAL COURT SHOULD HAVE GRANTED DEFENDANT'S MOTION FOR A NEW TRIAL PURSUANT TO R. 3:20-1 ON THE GROUNDS THAT A NEW TRIAL WAS REQUIRED IN THE INTEREST OF JUSTICE IN THAT VERDICTS WERE SHARPLY AGAINST THE WEIGHT OF THE EVIDENCE, NECESSITATING REVERSAL.

I.

Defendant's double jeopardy argument lacks merit. The underlying purpose of the Double Jeopardy Clause, U.S. Const. amend. V, is to prohibit the State from making "repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be

8                                                          A-5365-14T2

found guilty." Green v. United States, 355 U.S. 184, 187-88, 78 S. Ct. 221, 223, 2 L. Ed. 2d 199, 204 (1957).

Generally, however, the Double Jeopardy Clause does not "bar reprosecution of a defendant whose conviction is overturned on appeal[]" because, until the proceedings have run their full course, the defendant remains in a state of "continuing jeopardy." Justices of Bos. Mun. Court v. Lydon, 466 U.S. 294, 308, 104 S. Ct. 1805, 1813, 80 L. Ed. 2d 311, 324 (1984) (citation omitted). Additionally,

> double jeopardy . . . do[es] not prohibit retrial of a defendant when a prior prosecution for the same offense has ended in mistrial attributable to the inability of the jury to agree on a verdict, because the jeopardy to which the defendant is exposed is considered a continuation of original jeopardy, which was not terminated by the mistrial.
>
> [State v. Johnson, 436 N.J. Super. 406, 421 (App. Div. 2014) (alteration in original) (citation omitted) (quoting State v. Abbati, 99 N.J. 418, 425-26 (1985)).]

The State cannot reprosecute a defendant on a charge that is reversed because of insufficient evidence to support the conviction. See Lydon, supra, 406 U.S. at 308-09, 104 S. Ct. at 1813, 80 L. Ed. 2d at 325; State v. Kelly, 201 N.J. 471, 485 (2010). Nor can the State correct substantive failures of proof on remand. Reversal for failure of proof "means that the

government's case was so lacking that it should not have even been submitted to the jury." State v. Millett, 272 N.J. Super. 68, 97 (App. Div. 1994) (emphasis omitted) (quoting Burks v. United States, 437 U.S. 1, 16, 98 S. Ct. 2141, 2150, 57 L. Ed. 2d 1, 12-13 (1978)). "[A]lthough a remand for a new trial is proper where reversal of a criminal conviction is predicated on trial error, the Double Jeopardy Clause forbids a second trial where the conviction has been overturned due to a failure of proof at trial." State v. Tropea, 78 N.J. 309, 314 (1978) (citation omitted).

Here, there was neither a failure of proof nor lack of evidence. Although defendant, citing Kelly, supra, 201 N.J. at 485, argues the State cannot reprosecute a defendant on a charge reversed on appeal due to insufficient evidence, that is not what occurred here. Defendant's prior convictions were not reversed due to any failure of proof; rather, they were reversed due to a "trial error" attributable to the erroneous admission of prejudicial evidence. See Tropea, supra, 78 N.J. at 314-15. Thus, throughout both the first trial resulting in a mistrial, and the second trial resulting in overturned convictions, defendant has remained in a state of "continuing jeopardy." Lydon, supra, 466 U.S. at 308, 104 S. Ct. at 1813, 80 L. Ed. 2d at 324-25; Johnson, supra, 436 N.J. Super. at 421 (citing Abbati, supra, 99 N.J. at 425-26).

Neither the Supreme Court nor the Appellate Division found that if the rap lyrics were excluded, the remaining evidence was insufficient. The language in the Supreme Court's decision and the majority Appellate Division opinion explicitly discussed only the potential for prejudice created by admission of the rap lyrics in light of the State's proofs. In fact, in this case, in addition to the victim's direct testimony identifying defendant as the perpetrator, defendant's cell phone was discovered at the scene, and he admitted meeting the victim at the scene of the crime. Accordingly, double jeopardy principles do not apply. Since the prior reversal was not due to a lack of proof, defendant has been under continuing jeopardy.

## II.

Defendant also contends the State was collaterally estopped from retrying him on the aggravated assault with a firearm because the jury, during defendant's second trial, acquitted him of unlawful possession of a handgun and possession of a handgun for an unlawful purpose. Collateral estoppel is embodied in the Double Jeopardy Clause and "'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'"  State v. Brown, 394 N.J. Super. 492, 501 (App.

Div. 2007) (quoting Ashe v. Swenson, 397 U.S. 436, 443, 90 S. Ct. 1189, 1194, 25 L. Ed. 2d 469, 475 (1970)).

The United States Supreme Court has held the doctrine of collateral estoppel is not applicable when a jury, in a single trial, returns a verdict of acquittals and convictions that are inconsistent with one another. Kelly, supra, 201 N.J. at 487 (citing United States v. Powell, 469 U.S. 57, 62-67, 105 S. Ct. 471, 475-78, 83 L. Ed. 2d 461, 467-70 (1984)). "Our system of justice has long accepted inconsistent verdicts as beyond the purview of correction by our courts, and therefore a defendant is forbidden from collaterally attacking a guilty verdict on one count with an apparently irreconcilable acquittal on another count." Ibid. (citing Powell, supra, 469 U.S. at 58, 105 S. Ct. at 473, 83 L. Ed. 2d at 464).

The party asserting the collateral estoppel bar as a result of a second trial must show:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [Brown, supra, 394 N.J. Super. at 502 (emphasis omitted) (quoting First Union Natl

12

> Bank v. Penn Salem Marina, 190 N.J. 342, 352
> (2007)).]

Hence, when dealing with multiple trials, collateral estoppel may bar a later prosecution where the jury's acquittal in a prior case demonstrated its rejection of the essential facts on which the State sought to base a second prosecution. See State v. Cormier, 46 N.J. 494, 509 (1966).

In Yeager v. United States, 557 U.S. 110, 129 S. Ct. 2360, 174 L. Ed. 2d 78 (2009), the Court held that when a defendant is acquitted on some charges and the jury cannot reach a verdict on others, collateral estoppel principles may apply to the State's attempt to retry the defendant on the "hung counts." Id. at 121-23, 129 S. Ct. at 2368-69, 174 L. Ed. 2d at 89-90. In assessing the merits of a collateral estoppel argument, the jury's failure to return a verdict on the hung counts must be treated as a "nonevent." Id. at 120, 129 S. Ct. at 2367, 174 L. Ed. 2d at 88. That is, the trial court must not speculate on the jury's reasons for being unable to return a verdict, and instead should focus on the significance of the acquittal. Id. at 119-23, 129 S. Ct. at 2367-68, 174 L. Ed. 2d at 88-90.

The Court in Yeager discussed Ashe:

> In Ashe, we squarely held that the Double
> Jeopardy Clause precludes the Government from
> relitigating any issue that was necessarily
> decided by a jury's acquittal in a prior

trial.  In that case, six poker players were
robbed by a group of masked men.  Ashe was
charged with--and acquitted of--robbing
Donald Knight, one of the six players.  The
State sought to retry Ashe for the robbery of
another poker player only weeks after the
first jury had acquitted him.  The second
prosecution was successful:  Facing
"substantially stronger" testimony from
"witnesses [who] were for the most part the
same," Ashe was convicted and sentenced to a
35-year prison term.  We concluded that the
subsequent prosecution was constitutionally
prohibited.  Because the only contested issue
at the first trial was whether Ashe was one
of the robbers, we held that the jury's
verdict of acquittal collaterally estopped the
State from trying him for robbing a different
player during the same criminal episode.  We
explained that "when an issue of ultimate fact
has once been determined by a valid and final
judgment" of acquittal, it "cannot again be
litigated" in a second trial for a separate
offense.  To decipher what a jury has
necessarily decided, we held that courts
should "examine the record of a prior
proceeding, taking into account the pleadings,
evidence, charge, and other relevant matter,
and conclude whether a rational jury could
have grounded its verdict upon an issue other
than that which the defendant seeks to
foreclose from consideration."  We explained
that the inquiry "must be set in a practical
frame and viewed with an eye to all the
circumstances of the proceedings."

[Id. at 119-20, 129 S. Ct. at 2366-67, 174 L.
Ed. 2d at 87-88 (alteration in original)
(citations omitted).]

This case differs from Yeager, however, because there was no

valid final judgment of acquittal.  Defendant remained in a state

of "continuing jeopardy" during the pendency of the prior appeal

14                                              A-5365-14T2

and petition for certification. Lydon, supra, 466 U.S. at 308, 104 S. Ct. at 1813, 80 L. Ed. 2d at 324-25. "[S]eemingly inconsistent verdicts in the first trial," do not "establish that the jury determined an ultimate fact that precluded a retrial of the reversed convictions." Kelly, supra, 201 N.J. at 494. "Without the determination of an ultimate fact that can rationally foreclose some other issue from consideration, double-jeopardy principles do not apply." Id. at 488.

Furthermore, "[t]he defendant's burden is particularly difficult to satisfy when the jury has reached inconsistent verdicts. Such verdicts, whether based on error, confusion, or a desire to compromise, give little guidance as to the jury's factual findings." United States v. Citron, 853 F.2d 1055, 1058 (2d Cir. 1988). During his second trial, although acquitted of possession of a handgun and possession of a handgun for an unlawful purpose, he was convicted of assault with a deadly weapon—a handgun—a seemingly inconsistent verdict.

In addressing this collateral estoppel argument, the crucial factor is that the jury convicted appellant of two counts of aggravated assault with a weapon in the second trial. See Evans v. United States, 987 A.2d 1138, 1141-42 (D.C. Jan. 28, 2010), cert. denied, 562 U.S. 1202, 131 S. Ct. 1043, 178 L. Ed. 2d 867 (2011). "The problem is that the same jury reached inconsistent

results; once that is established principles of collateral estoppel -- which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict -- are no longer useful." Id. at 1141 (citing Powell, supra, 469 U.S. at 68, 105 S. Ct. at 478, 83 L. Ed. 2d at 471); accord Standefer v. United States, 447 U.S. 10, 23 n.17, 100 S. Ct. 1999, 2007, 64 L. Ed. 2d 689, 699 (1980) ("This inconsistency is reason, in itself, for not giving preclusive effect to the acquittals[.]"). As Justice Holmes explained, "[t]he most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." Dunn v. United States, 284 U.S. 390, 393, 52 S. Ct. 189, 190, 76 L. Ed. 356, 359 (1932) (quoting Steckler v. United States, 7 F.2d 59, 60 (2d Cir. 1925)).

"Our system of justice has long accepted inconsistent verdicts as beyond the purview of correction by our courts, and therefore a defendant is forbidden from collaterally attacking a guilty verdict on one count with an apparently irreconcilable acquittal on another count." Kelly, supra, 201 N.J. at 487 (citation omitted). Since defendant would have been precluded from attacking the disparity between his convictions for attempted murder and aggravated assault, and acquittals for

weapons charges, following his second trial, defendant must also be barred from asserting collateral estoppel when those convictions were later overturned due to the erroneous admission of prejudicial evidence. The verdicts, assuming for the sake of argument that they were inconsistent, could not have been successfully attacked then. They cannot be attacked now after a third trial, required as a result of the reversal following his second trial. Furthermore, the jury in this trial was specifically asked about defendant's alleged use of a 9-millimeter handgun on the assault with a deadly weapon. There was neither an inconsistency between verdicts, nor was the State collaterally estopped from this prosecution.

## III.

Defendant argues that the doctrine of fundamental fairness should have resulted in the dismissal of the indictment. "The doctrine of fundamental fairness 'serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily.'" State v. Saavedra, 222 N.J. 39, 67 (2015) (emphasis omitted) (quoting Doe v. Poritz, 142 N.J. 1, 108 (1995)). The Supreme Court has described this doctrine as "an integral part of due process" that "is often extrapolated from or implied in other constitutional guarantees." State v. Miller, 216 N.J. 40, 71

17

(2013), <u>cert. denied</u>, ___ <u>U.S.</u> ___, 134 <u>S. Ct.</u> 1329, 188 <u>L. Ed.</u> 2d 339 (2014) (quoting <u>Oberhand v. Dir., Div. of Taxation</u>, 193 <u>N.J.</u> 558, 578 (2008)); <u>see also</u> <u>Abbati</u>, <u>supra</u>, 99 <u>N.J.</u> at 429.

The doctrine is applied "sparingly" and only where the "interests involved are especially compelling[;]" if a defendant would be subject "to oppression, harassment, or egregious deprivation," it is be applied. <u>Doe</u>, <u>supra</u>, 142 <u>N.J.</u> at 108 (quoting <u>State v. Yoskowitz</u>, 116 <u>N.J.</u> 679, 712 (1989) (Garibaldi, J., concurring and dissenting)). It can be applied "at various stages of the criminal justice process even when such procedures were not constitutionally compelled." <u>Ibid.</u> (citations omitted). The doctrine's "primary considerations should be fairness and fulfillment of reasonable expectations in the light of the constitutional and common law goals." <u>Yoskowitz</u>, <u>supra</u>, 116 <u>N.J.</u> at 706 (emphasis omitted) (quoting <u>State v. Currie</u>, 41 <u>N.J.</u> 531, 539 (1964)).

The doctrine is an "elusive concept" and its "exact boundaries are undefinable." <u>Id.</u> at 704-05 (citation omitted). "For the most part, it has been employed when the scope of a particular constitutional protection has not been extended to protect a defendant." <u>Id.</u> at 705. Dismissal on grounds that a further prosecution is fundamentally unfair is necessary because "[t]he primary considerations should be fairness and fulfillment of

reasonable expectations in the light of the constitutional and common law goals." Currie, supra, 41 N.J. at 539 (citation omitted). The fundamental fairness doctrine does not preclude a retrial where "the elements of harassment and oppression which [are] the historic object of the constitutional and common law . . . principles are not . . . present." State v. Tsoi, 217 N.J. Super. 290, 297 (App. Div. 1987).

In Abbati, supra, 99 N.J. at 435, the Supreme Court, noting that although principles of double jeopardy did not bar a retrial, reversed the Appellate Division and remanded the case to the trial court to reconsider based on a newly articulated standard regarding whether an indictment should be dismissed. It required evaluation of the following factors:

> (1) [T]he number of prior mistrials and the outcome of the juries' deliberations, so far as is known; (2) the character of prior trials in terms of length, complexity, and similarity of evidence presented; (3) the likelihood of any substantial difference in a subsequent trial, if allowed; (4) the trial court's own evaluation of the relative strength of each party's case; and (5) the professional conduct and diligence of respective counsel, particularly of the prosecuting attorney.
>
> [Ibid.]

See also State v. Cruz, 171 N.J. 419, 430 (2002).

The "trial court may dismiss an indictment with prejudice after successive juries have failed to agree on a verdict when it

19

determines that the chance of the State's obtaining a conviction upon further retrial is highly unlikely." Abbati, supra, 99 N.J. at 435 (citation omitted). The "court must also give due weight to the prosecutor's decision to reprosecute, assessing the reasons for that decision, such as the gravity of the criminal charges and the public's concern in the effective and definitive conclusion of criminal prosecutions." Ibid. "Conversely, the court should accord careful consideration to the status of the individual defendant and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness." Ibid.

Discussing the Abbati factors when the September 29, 2014 decision was rendered, the trial judge found:

> One, . . . we have a hung jury and a conviction but now these rap lyrics are out if there's a third trial.
>
> Two, . . . the rap lyrics are out so the evidence presumably is weaker for the State than it was before, but doesn't certainly fall, in my view, on my analysis, to insufficient evidence to prove a case but it is a piece that is missing that was there before. . . . The[re] were eight trial days approximately. And so, . . . in terms of length and complexity, it's not overly — this is not a seven week trial. This is not . . . something that took months and months. So in the continuum of trials, it falls in that mid[-]range. It's certainly not a quick simple nothing trial . . . [b]ut it's also not something that took weeks and weeks.

Three, the likelihood of any substantial difference in a subsequent trial, if allowed. And this is the argument that [defendant's attorney] was making . . . how's the case going to get any stronger for the State? Well, it's not . . . Yes, you're pulling the rap lyrics out, that may make it a little weaker. But [the State is] not left with nothing, they still have his testimony that even both the Appellate Court and the Supreme Court provided some sufficiency and [N.J.R.E.] 404(b) was only bolstering their case. So yes, there is a case to be made. . . .

[Factor four,] the [t]rial [c]ourt's own evaluation of the relative strength of each party's case, I don't mean to repeat myself, I think I've gone through that quite a bit on the relative proofs.

Five, the professional conduct and diligence of respective counsel, particularly of the prosecuting attorney. This is really the bad faith piece that [defendant's attorney] is asserting, but the [c]ourt is not accepting, that the State acted in bad faith in admitting or trying to admit the rap lyrics. I think they felt that it was legitimate . . . evidence. You have a trial judge who said it was. You have at least one appellate judge [who] said it was, it was a split decision that went up to the Supreme Court. So it wasn't so off base . . . . Undoubtedly the Supreme Court was unanimous in their decision. But this happens. That doesn't necessarily lead to [] bad faith. . . . [T]his was something [the State] felt was a legitimate piece of proof and ultimately it was determined that was improper and incorrect. . . .

So given the Abbati factors and weighing them on a qualitative and quantitative basis, this [c]ourt is not persuaded that there was such fundamental [un]fairness in retrying the

case as there would be after multiple mistrials. . . .

In addition, and I already made the point about still having [sixteen] and a half years left of a sentence to serve if you look at the [thirty] years and that's the way the cases have done it. They've taken the sentence that was given and determined how much of that would be left. As so again, that wouldn't lead the [c]ourt to find fundamental unfairness such that I would dismiss the indictment at this juncture[.]

After the trial, the trial judge did not expressly address defendant's argument regarding fundamental fairness, but referred back to her prior analysis.

We agree with the trial court's initial analysis of the Abbati factors. Principles of fundamental fairness did not bar a retrial.

IV.

Defendant contends, in his counseled and uncounseled brief, that he should have been granted a new trial because the verdict was against the weight of the evidence. We do not agree. The jury's verdict clearly hinged upon its conclusion that the victim was a credible witness.

On its face, contrary to defendant's arguments, the record supports the jury's determination. The victim's testimony that defendant called him repeatedly to set up the meeting was supported by telephone communication records. Defendant acknowledges that he was at the scene and left his cell phone there. The ballistics

22

evidence corroborated that all seven shots were fired from the same 9-millimeter handgun, which the victim said he recognized. The victim's initial identification of defendant as the shooter was made while there was a question as to his very survival, while he was being transported from the scene after being shot seven times.

"[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (alteration in original) (citations omitted) (internal quotation marks omitted) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)). Moreover, the governing standard set forth in Rule 3:20-1 provides that:

> The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice. . . . The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

There is no "miscarriage of justice" when "any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present." State v. Jackson, 211 N.J.

394, 413-14 (2012) (citations omitted) (quoting State v. Afanador, 134 N.J. 162, 178 (1993)). "Thus, we review defendant's conviction . . . under an extraordinarily lenient standard of review." Id. at 414.

We do not attempt to reconcile the verdicts on the different counts nor do we speculate whether verdicts resulted from "jury lenity, mistake, or compromise," and even inconsistent verdicts. State v. Muhammad, 182 N.J. 551, 578 (2005). We consider the evidence presented in support of each count as though it were presented in a separate indictment. Ibid. (citation omitted). The jury verdict will be upheld where there is sufficient evidence to support the conviction. Ibid. (citations omitted).

In denying the motion for a new trial, the trial judge stated:

> The State presented testimony including investigating officers, lay witnesses and the victim who identified the defendant as the shooter including the EMT and Lieutenant Dey. The State also presented physical evidence from the scene. The defendant . . . put himself at the scene. . . .
>
> I am only to determine whether that minimal standard has been met, that the jury could have found this and it was not a manifest denial of justice for them to find guilt on those convictions. And given all of that evidence, the [c]ourt certainly does not find that the verdict was against the weight of the evidence under that standard.

24

We are satisfied that the judge's decision was a proper exercise of discretion. No miscarriage of justice occurred.

                                    V.

Finally, defendant contends that no mandatory extended term was appropriate under N.J.S.A. 2C:43-6(c) because the jury acquitted defendant during his second trial of possession of a handgun. The jury concluded in the third trial, however, that defendant was guilty of the assault while armed with a gun. Therefore, application of the statute was appropriate.

The judge found Aggravating Factors 3, 6, and 9 outweighed Mitigating Factors 3, 4, and 5. N.J.S.A. 2C:44-1. She accorded substantial weight to the Aggravating Factors and less to the Mitigating Factors, and her decision to do so was supported by the record. The sentence of sixteen years was a reasonable exercise of discretion, a balancing of the relevant factors that squarely accords with the law. The sentence was well within the range. It does not shock our conscience. See State v. Roth, 95 N.J. 334, 364-69 (1984).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5365-14T2